# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA )
*EX REL.* NILES ROSEN, M.D. )
     )     CASE NO. 8:19-cv-1526-T-35
     PLAINTIFFS, )
     )
     v. )
     )     **FILED IN CAMERA &**
EXACT SCIENCES CORPORATION )     **UNDER SEAL**
AND EXACT SCIENCES )     **(AS REQUIRED BY 31**
LABORATORIES, LLC )     **U.S.C. § 3730(b)(2))**
     DEFENDANTS. )
     )
     )
     )
     )
     )

## FIRST AMENDED *QUI TAM* COMPLAINT
## AND DEMAND FOR JURY TRIAL

1.     Relator, Niles Rosen, M.D., brings this action on behalf of the United States against Exact Sciences Corporation and Exact Sciences Laboratories, LLC (collectively referred to herein as "Exact Sciences" or "Defendants") under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et. seq.* (the "FCA") and alleges the following:

1

## OVERVIEW

2.    Defendants have violated the Federal Anti-kickback Statute and the False Claims Act by offering and/or paying remuneration to beneficiaries of Medicare and other government healthcare programs ("government beneficiaries") to induce them to undergo Defendants' colon cancer screening test known as "Cologuard," and then knowingly submitting false claims for reimbursement for Cologuard tests to Medicare and other government payers. Medicare reimburses Defendants approximately $500 for each Cologuard test.

3.    To increase their revenue at the expense of government healthcare programs, Defendants unlawfully offer remuneration (kickbacks) to government beneficiaries in the form of cash equivalents, including for example, $75 Visa reward cards that can be used "everywhere Visa debit cards are accepted," if the beneficiaries will undergo Defendants' Cologuard screening test so Defendants can generate a bill for the test and send it to the government.  Defendants' claims for payment from government healthcare programs for the Cologuard tests are false claims under the False Claims Act because they are tainted by Defendants' kickback scheme.

4.    Defendants offer remuneration to government beneficiaries specifically to induce them to take the Cologuard test rather than using other effective and less expensive colon cancer screening tests available through providers other than Defendants.

5.      Defendants' conduct does not fall under any of the exceptions or safe harbors to the Anti-kickback statute.

6.      Defendants knew they had offered remuneration to induce government beneficiaries to take the Cologuard test (in violation of the AKS) when Defendants submitted claims for reimbursement for Cologuard to government payers.

7.      Defendants' fraudulent claims for payment for Cologuard have resulted in damages to Medicare and other government healthcare programs.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345, 28 U.S.C. §1331, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

9.      This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants transacts business in and has committed acts related to the allegations in this Complaint in the Middle District of Florida. For example, Relator received the unlawful offer of remuneration from Defendants in the Middle District of Florida.

10.     Venue is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c) because at least one of the Defendants can be found in, resides in, or transacts business in the Middle District of Florida and because violations of 31 U.S.C. § 3729 discussed herein occurred in this judicial district.

## PARTIES

11.　　Relator, Niles Rosen, M.D. is a resident of Florida. He is 72 years-old and is a Medicare beneficiary. After practicing pathology for approximately 20 years, he became the Medical Director of the CMS National Correct Coding Initiative (NCCI) program in 1998.  In late 2005, he also assumed the role of Program Director of the NCCI.  Relator retained both of these positions until he retired in March 2019.   The purpose of the CMS NCCI program is to promote correct coding and reduce inappropriate payments.  Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and has made voluntary disclosures to the government prior to the filing of this lawsuit.

12.　　Defendant Exact Sciences Corporation ("ESC") (NASDAQ-EXAS) is located at 441 Charmany Drive, Madison, WI, 53719; is incorporated in Delaware; and is registered to do business in Florida with the Florida Department of Corporations.

13.　　Defendant Exact Sciences Laboratories, LLC ("ESL") is a wholly-owned subsidiary of ESC.  ESL is located at 145 E. Badger Road, Suite 100, Madison, WI, 53713; is incorporated in Delaware; and is registered with the Florida Department of Corporations. ESL's National Provider Identifier (NPI) is 1629407069. ESL administers the colon cancer screening test known as Cologuard, which is available for use in all U.S. states. All Cologuard tests are processed and completed by ESL at its laboratory in Madison, WI. ESL handles

billing for Cologuard and submits claims to government payers for Cologuard tests.

## REGULATORY BACKGROUND

### The Medicare Program

14.     Enacted in 1965, Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program.

15.     The Medicare Program is comprised of four parts:  Part A which provides Hospital Insurance Benefits, Part B which provides Medical Insurance Benefits, Part C which establishes Medicare Advantage (or managed care) plans, and Part D which provides for Prescription Drug Benefits.

16.     Medicare is administered by the Centers for Medicare & Medicaid Services (CMS).  At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors," to act as agents in reviewing and paying claims submitted by healthcare providers.  Payments are made with federal funds.  *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

17.     As a Medicare provider, Defendants were obligated to understand and certify their compliance with the Anti-kickback statute and all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements.

18.     As a condition of enrollment in the Medicare program, suppliers/providers, such as Defendants, must sign the "Section 15: Certification Statement" in Form CMS-855B. The version of the CMS-8555B in effect at the time Defendants offered the prohibited remuneration to Relator contained the following requirement in the certification statement.

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

19.     CMS-8555B was revised in July 2020, and the revised version also contains a provision in the certification statement requiring compliance with the Anti-kickback statute, specifically.

20.     Certification of compliance and actual compliance with the Anti-kickback statute are requirements for obtaining and maintaining eligibility to bill Medicare and receive federal funds in response. Section 15 of CMS-855B states: "These are additional requirements that the supplier must meet and maintain in order to bill the Medicare program."

21.     The certification in CMS-855B also states:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

22.　Medicare providers, such as Defendants, are reimbursed for covered services based on their submission of an electronic or hard-copy claim form called the CMS Form 1500 Health Insurance Claim Form. The CMS Form 1500 (or its electronic equivalent, known as the 837P format) requires providers, like Defendants, to expressly certify that each claim submitted complies "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

23.　When Defendants submitted claims for Cologuard tests while intentionally and knowing engaged in paying remuneration to beneficiaries to induce referrals, a violation of the Anti-kickback Statute, each certification of compliance on Claim Form CMS 1500 (or the 837P format electronic claim) was an express false certification.

### The Anti-kickback Statute

24.　The federal Anti-kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. Beneficiary steering and anti-competitive effects are traditional risks of fraud and abuse that the AKS was designed to prevent.

25.     The AKS provides as follows:

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

26.     A claim for payment that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim under the False Claims Act. 42 U.S.C. § 1320(a)-7b(g).

27.     Under the AKS, "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320(a)-7b(h).

### Recent Amendments to the Regulatory Safe Harbors Under the Anti-Kickback Statute Specifically Reject Extending Protection to Laboratory Companies like Defendants and Do Not Protect Cash Equivalent Inducements Due to the Risk of Fraud and Abuse

28.     Defendants' conduct does not fall under any of the exceptions or safe harbors to the AKS, including the recently added Patient Engagement and Support Safe Harbor. In fact, in its recent amendments to the AKS regulatory safe harbors (December 2020), HHS-OIG specifically rejected any extension of the

Patient Engagement and Support Safe Harbor's protection from AKS liability to laboratory companies such as Defendants. HHS-OIG explained that "laboratory companies" are entities that are "ineligible to use the safe harbor to furnish protected remuneration to patients." 85 Fed. Reg. 77782. Specifically, HHS-OIG explained that it excluded laboratories (and certain other types of provider entities) from the safe harbor "based on our longstanding enforcement and oversight experience, that certain types of entities [including laboratory companies] present a higher risk of misusing this safe harbor primarily or significantly to offer remuneration to beneficiaries as a means to market their products and services rather than to improve the coordination and management of patient care." 85 Fed. Reg. 77782.

29.     But even for entities that *are* eligible for the Patient Engagement and Support Safe Harbor protections, unlike Defendants, only in-kind remuneration may be protected and only if all other conditions have been met; cash or cash equivalents (such as Visa reward cards) are expressly not allowed. 85 Fed. Reg. 77792.

30.     Indeed, OIG specifically rejected comments seeking to extend safe harbor protection to remuneration in the form of cash equivalents. *Id.* In enacting the final rulemaking, OIG explained the dangers of cash equivalents (such as Defendants' Visa reward card) as follows:

> With respect to incentives in the form of cash or cash equivalents, we are concerned about heightened fraud and abuse risk. As noted in the OIG Proposed Rule, OIG historically has had significant concerns with allowing

9

providers and others to offer cash or cash equivalents to patients, and our oversight and enforcement experience suggests that cash incentives can result in medical identity theft and misuse of patients' Medicare numbers, lead to inappropriate utilization (in the form of medically unnecessary items and services), and cause improper patient steering (including patients selecting a provider because the provider offers the most valuable incentives and not because of the quality of care the provider furnishes).

85 Fed. Reg. 77792.

31.     OIG articulated that, "Cash, cash equivalents, and most gift cards are excluded in the final rule because the safe harbor is limited to in-kind remuneration . . . we believe restricting protection to in-kind remuneration in the final rule reflects OIG's longstanding concern about the fraud and abuse risks inherent to providing cash, cash equivalents, or gift cards to beneficiaries." 85 Fed. Reg. 77789.

32.     Defendants cannot hide in any safe harbor from AKS and FCA liability based on their blatant offers of cash equivalent remuneration to induce Medicare and other government beneficiaries to use their Cologuard test by submitting test samples to enrich Defendants at government expense.

**Defendants Had a Duty to Report and Return Overpayments to Medicare**

33.     The Medicare and Medicaid program statutory integrity provisions mandate that Defendants were required to report and refund known overpayments.  42 U.S.C. § 1320a-7k(d).  Specifically, the law provides as follows:

(d) Reporting and returning of overpayments
         (1) In general
         If a person has received an overpayment, the person shall –

(A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and

(B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

(2) Deadline for reporting and returning overpayments

An overpayment must be reported and returned under paragraph (1) by the later of --

(A) the date which is 60 days after the date on which the overpayment was identified; or

(B) the date any corresponding cost report is due, if applicable.

(3) Enforcement

Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31) for purposes of section 3729 of such title.

34.    Payments for claims received in violation of the AKS are overpayments, and overpayments retained after the deadline for reporting and returning the overpayments are "obligations" for purposes of §3729(a)(1)(G) of the False Claims Act.

## FACTUAL ALLEGATIONS

### The Cologuard Colon Cancer Screening Test

35.    Cologuard is indicated to screen adults of either sex, 50 years of age or older, who are at average risk for colon cancer. See, e.g., ESL Letter to Relator dated 2-8-2018, attached hereto as Exhibit 1 (the "Offer Letter") (redacted to protect patient privacy). The Cologuard test is intended for the qualitative detection of colorectal neoplasia associated DNA markers and for the presence of occult hemoglobin in human stool. Id. at 2.  According to Defendants, "[a]

11

positive result may indicate the presence of colorectal cancer or advanced adenoma and should be followed by a diagnostic colonoscopy." Id. In the Offer Letter, Defendants, themselves, warn that "Cologuard results should be interpreted with caution for individuals over age 75 as the rate of false positive results increases with age." Id. A false positive Cologuard test on a beneficiary of any age could very likely lead to an unnecessary colonoscopy for the patient who undertook the Cologuard test, subjecting the government beneficiary to the unnecessary invasive medical procedure and at significant expense to the government.

36.    Cologuard was approved by the FDA in August 2014 and was issued a National Coverage Determination (NCD) by CMS in October 2014. Cologuard is one of the tests listed under NCD Section 210.3 for Colorectal Cancer Screening Tests. According to NCD Section 210.3, Medicare Part B will reimburse for Cologuard testing on a beneficiary *only once every three years* for beneficiaries who meet all of the following criteria:

  a.  Age 50 to 85 years,

  b.  Asymptomatic (no signs or symptoms of colorectal disease including but not limited to lower gastrointestinal pain, blood in stool, positive guaiac fecal occult blood test (gFOBT) or fecal immunochemical test (iFOBT)), and,

  c.  At average risk of developing colorectal cancer (no personal history of adenomatous polyps, colorectal cancer, or inflammatory bowel disease, including Crohn's Disease and ulcerative colitis; no family history of colorectal cancers or adenomatous polyps, familial adenomatous polyposis, or hereditary nonpolyposis colorectal cancer).

12

Thus, Medicare does not consider Cologuard a risk-free test that can and should be performed annually, but only once every three years.

37.     The Clinical Laboratory Fee Schedule for both 2018 and 2019 set the CMS reimbursement rate for Cologuard at $508.87. Defendants use CPT code 81528 to bill for the Cologuard test, and prior to January 1, 2016, they used HCPCS code G0464.

38.     According to paid claims data for 2018(openpaymentsdata.cms.gov), Defendants billed Medicare for 334,424 Cologuard tests and Medicare paid Defendants approximately $500 for each of those Cologuard tests. Therefore, in 2018 alone, Medicare paid Defendants more than $160 million for Cologuard tests while Defendants were offering unlawful cash equivalent inducements directly to government beneficiaries. In Defendant ESC's SEC 10K report filed for fiscal year ending 12/31/18, ESC explains that a "critical part" of its "Cologuard commercialization strategy" is getting patients to take the Cologuard test.  ESC describes "several activities" undertaken in 2018 "to promote patient compliance including . . . incentives such as gift cards."

**Relator received Defendants' offer of cash equivalent remuneration to undergo Defendants' Cologuard test, took the test, received the payment, and Defendants billed Medicare for the Cologuard test he underwent.**

39.     In the fall of 2017, Relator's gastroenterologist, Dr. Henry Levine, suggested that Relator, who was asymptomatic for colon cancer, undergo a Cologuard colon cancer screening test.

40.     Dr. Levine prescribed the Cologuard test for Relator on or about November 17, 2017.

41.     ESL thereafter forwarded a Cologuard stool collection kit to Relator, but Relator decided not to take the Cologuard test and did not return the kit with a test sample. Relator was aware that Cologuard is not the only effective colorectal screening test available. In fact, it was his opinion that there are other effective colorectal screening tests that are less expensive and more convenient. For example, as a physician, Relator was familiar with the fecal occult blood tests (FOBTs) which are used to screen for colorectal cancer. Fecal occult blood tests are divided into two types: immunochemical (iFOBT) and guaiac (gFOBT). The availability of these other tests contributed to Relator's initial decision not to take the Cologuard test.

42.     On February 8, 2018, Defendants sent to Relator at his residence (located in the Middle District of Florida) a letter offering him a $75 Visa reward card if he would complete the Cologuard test and send to ESL the Cologuard test kit with the required specimen by a certain date. Specifically, the letter stated:

> Because your health is important, Exact Sciences Laboratories will send you a $75 Visa reward card for completing your Cologuard Test! In order to qualify for this special offer, your sample must be received at Exact Sciences Laboratories by Thursday, March 22, 2018.

Offer Letter, Exhibit 1 at 1.

43.    Relator then decided to take the Cologuard test and sent the kit to ESL because he wanted the $75 Visa reward card.

44.    After Relator submitted the specimen to ESL as a result of Defendants' inducement, he received the $75 Visa reward card from Defendants enclosed in a letter that made clear that the Visa reward card was essentially cash.  It stated, "Visa Reward Cards can be used everywhere Visa debit cards are accepted."  See Letter enclosing Visa reward card, attached hereto as Exhibit 2 (redacted to protect patient privacy).

45.    Relator used the Visa reward card to purchase items unrelated to his healthcare.

46.    Relator received the results of the Cologuard test from a patient report from ESL.

**A Representative False Claim**

47.    Relator investigated whether ESL had submitted a claim to Medicare for his Cologuard test on the "MyMedicare.gov" site.  It showed that on March 1, 2018, Medicare received a claim from Defendants for Relator's Cologuard test. See Claim Details, attached hereto as Exhibit 3.  The procedure code is listed as 81528 and the procedure date is February 21, 2018.  Defendants charged $649.00 and Medicare reimbursed Defendants $498.69. Id. Medicare processed the payment of this claim for Part B services on March 14, 2018.  Id. Defendant ESL's claim to Medicare for Relator's Cologuard test is a representative example of the

thousands of such false claims submitted to government payers for the Cologuard lab test.

**Defendants acted with knowledge that their conduct was unlawful when they offered cash equivalent remuneration to government beneficiaries to induce them to undergo Defendants' colon cancer screening test**

48.     Defendants offer the Visa reward cards to induce government beneficiaries, such as Relator, to complete and return their Cologuard tests to ESL because without the beneficiaries choosing to undergo the test, Defendants cannot submit claims for reimbursement to government healthcare programs for the tests.

49.     Defendants' offer of a $75 Visa reward card was the offer of a kickback. In this instance, that offer did in fact induce a government beneficiary to undergo the Cologuard test and enable the offeror to bill the government for the test. Relator would not have chosen Exact Sciences as his provider and would not have undergone the Cologuard test absent the $75 inducement offered by Defendants, but the AKS violation was complete when Defendants made the offer of the remuneration.

50.     Under the AKS, it is unlawful for Defendants to knowingly pay remuneration to a government beneficiary to induce such person to complete Defendants' Cologuard test for which payment may be made in whole or in part by a government healthcare program.

51.    Defendants' cash equivalent inducements constitute unlawful remuneration under the AKS. Defendants offer the cash equivalent incentives to government beneficiaries to induce them to take the Cologuard tests, and then seek reimbursement from government healthcare programs for the kickback-tainted claims for the tests.

52.    Defendants were fully aware of their obligation to comply with the AKS in order to participate in and receive payment under the Medicare program. Defendants certified their compliance with the AKS in the Medicare Enrollment CMS-855B form and on every CMS Form 1500 (or its electronic equivalent) claim form.

53.    In addition, in their 2018 SEC 10K filing, Defendants acknowledge their duty to comply with the AKS as well as the sanctions that can be imposed for violations of the AKS, including "criminal penalties, civil monetary penalties and exclusion from participation in federal healthcare programs." The 10K states that remuneration under the AKS "has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangement, payments of cash . . ."

54.    Defendants knowingly and willfully broadly targeted Medicare beneficiaries as part of their kickback scheme as evidenced by the language in their Offer Letter: "If You Have Medicare or Medicare Advantage: For Medicare and Medicare Advantage patients, the test is fully covered."  See Exhibit 1 hereto. Defendants already knew from his doctor's prescription that Relator was a

Medicare beneficiary, demonstrating that this is a form letter used to reach myriad government beneficiaries and that the scheme is a very broad one.

55.     Defendants intended for the Visa reward cards to be inducements to government beneficiaries to submit specimens to ESL for Cologuard testing so that Defendants could submit claims for government reimbursement for that testing.

56.     Defendants knew that if the beneficiaries chose not to send their specimens to ESL, Defendants would not be able to perform Cologuard testing on those specimens and would therefore not be able to bill the government for the tests or receive the approximately $500 per test in reimbursement.

57.     Defendants offered the cash equivalent inducements to government beneficiaries so they would use Cologuard instead of competing products. Defendants recognized government beneficiaries as potential customers and marketed directly to them.

58.     In its 2018 SEC 10K, Exact Sciences Corporation stated that "the market for colorectal cancer screening is highly competitive." The 10K also states:

> Given the large market for colorectal cancer screening, we face numerous competitors, some of which possess significantly greater financial and other resources and development capabilities than us. Our Cologuard test faces competition from procedure based detection technologies such as colonoscopy, flexible sigmoidoscopy, and "virtual" colonoscopy, a radiological imaging approach that visualizes the inside of the bowel by CT scan (spiral computerized axial tomography), as well as other common screening tests, such as the fecal occult blood test ("FOBT") and the fecal immunochemical test ("FIT"), and newer screening technologies such as pill-based imaging solutions like PillCam COLON, cleared by the FDA in February 2014, and CScan, which obtained a CE Mark in early 2019.

18

59.     Defendants' competitors have had to compete for market share with Defendants' unlawful $75 kickback to Medicare beneficiaries.

60.     Defendants knew that offering cash equivalent inducements, such as the Visa reward cards, to government beneficiaries to cause them to undergo Cologuard testing was unlawful and that submitting claims to Medicare for that testing, knowing those claims were ineligible for payment, was also unlawful.

61.     As a physician, Relator has read that the Cologuard test has a very high rate of false positive test results for colon cancer. Relator is concerned that Defendants are using cash equivalents to induce patients to undergo a test that can cause patient harm because it can result in significant emotional, physical, and financial stress to individuals who are led to believe that they may have colon cancer when in fact they do not and to undergo potentially dangerous colonoscopies for no reason. Medicare pays for those unnecessary colonoscopies and other medical expenses caused by the Cologuard false positive test results.

62.     Because Defendants' Cologuard test is available in all U.S. states and because the letter that Relator received from Defendants offering the inducement is a form letter containing general instructions to beneficiaries of Medicare and Medicare Advantage plans, it is apparent that Defendants have engaged in this improper practice with regard to Medicare beneficiaries on a widespread, nationwide basis.

63.    As described above, in addition to the claim for Relator's Cologuard test, in 2018, Defendants submitted and Medicare paid more than 330,000 claims for Cologuard tests.

64.    In Relator's own personal experience, Defendants were sending the offer of the $75 in remuneration for taking the Cologuard test to government healthcare beneficiaries in February of 2018.

65.    The government has been damaged by Defendants' false claims for payment for Cologuard in at least the amount of Medicare claims paid for Cologuard testing since Defendants began their scheme to induce the use of Cologuard and submission of tests that generate false claims for government beneficiaries in violation of the AKS, that is at least as early as February 2018.

### MATERIALITY

66.    Defendants' violations of the AKS are material to the government's decisions to pay Defendants' claims for Cologuard under 42 U.S.C. § 1320(a)-7b(g), which explains that a claim for payment that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim under the False Claims Act.

67.    "'Material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 2739(b)(4).

## COUNT I

### Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

68.     Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

69.     Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to Medicare and other government healthcare payers.

70.     As set forth above, Defendants, in violation of the AKS, knowingly and willfully provided kickbacks to government beneficiaries to induce those government beneficiaries to undergo Defendants' colon cancer screening test to allow Defendants to submit false claims to Medicare and other government healthcare programs for those tests.

71.     Defendants knowingly submitted false claims for payment to Medicare and other government healthcare programs for Cologuard tests that were false because they were tainted by Defendants' ongoing violations of the AKS to induce government beneficiaries to undergo Cologuard tests.

72.     The United States, unaware of the falsity of the claims submitted by Defendants, paid money to Defendants that it otherwise would not have paid.

73.     By reason of Defendants' false claims submitted to and paid by the United States, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT II

### Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

74.    Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

75.    Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

76.    Defendants knowingly made a false record or statement material to a false or fraudulent claim each time they expressly certified their compliance with the AKS on the Claim Form CMS 1500 (or its electronic format). Defendants knew that their certification of compliance with the AKS was false. Defendants knew that they were not in compliance with the AKS because, as set forth above, they knowingly and willfully provided kickbacks to government beneficiaries to induce those government beneficiaries to decide to undergo Defendants' colon cancer screening test so that they could unlawfully bill and receive reimbursement from Medicare and other government healthcare programs.

77.    The United States, unaware of the falsity of Defendants' statements of compliance with the AKS paid money that it otherwise would not have paid.

78.    As a result of Defendants' fraud, the United States has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT III

### Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

79.      Relator realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

80.      Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or by knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

81.      The payments from Medicare for claims for Cologuard tests that Defendants received in violation of the AKS are overpayments under 42 U.S.C. § 1320a-7k(d).   Defendants knew they were in violation of the AKS and were not entitled to receive or retain payment for the Cologuard tests due to their noncompliance and knowledge of the kickback scheme alleged herein. Defendants have had a duty to report and refund all such known overpayments.

82.      Defendants retained the overpayments after the deadline for reporting and returning the overpayments. The overpayments constitute obligations under the False Claims Act, § 3729(a)(1)(G).

83.      Defendants have knowingly avoided their obligation to return the overpayments from Medicare and other government healthcare programs.

84. As a result of Defendants' violation of § 3729(a)(1)(G), the United States has suffered and continues to suffer damages in an amount to be determined at trial.

### PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et. seq.*

2. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as the maximum civil penalty for each violation of 31 U.S.C. § 3729 in accordance with 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.


DATED: 12th day of April, 2021

Respectfully submitted,

ELAINE J. STROMGREN
Florida Bar No.: 0417610
**Wilbanks and Gouinlock, LLP**
One Ameris Center
3490 Piedmont Rd., NE
Suite 1010
Atlanta, Georgia 30305
Direct Dial:  (813) 425-1039
Firm:  (404) 842-1075
ejs@wilbanksgouinlock.com

MARLAN B. WILBANKS
mbw@wilbanksgouinlock.com
SUSAN S. GOUINLOCK
ssg@wilbanksgouinlock.com
**Wilbanks and Gouinlock, LLP**
One Ameris Center
3490 Piedmont Rd., NE
Suite 1010
Atlanta, Georgia 30305
(404) 842-1075

(subject to pro hac vice admission)

Counsel for Relator

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by U.S. Mail, this 12th day of April, 2021 to the following:

Mamie Wise
Assistant U.S. Attorney
U.S. Attorney's Office
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

David T. Cohen
Senior Trial Counsel
U.S. Department of Justice
Civil Division
175 N. Street, NE
Washington, DC 20002

ELAINE J. STRØMGREN